## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

COMRENT INTERNATIONAL, LLC,

    Plaintiff,

    v.

ROBERT THOMSON and DISTRIBUTED POWER SOLUTIONS, LLC,

    Defendants.

\*    \*    \*    \*    \*    \*

    Civil Action No. RDB-20-3757

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiff ComRent International, LLC ("ComRent" or "Plaintiff") brings this suit against its former employee, Defendant Robert Thomson ("Thomson"), and his new employer, Defendant Distributed Power Solutions, LLC ("DPS") (collectively "Defendants").[1]  ComRent alleges breach of contract against Thomson (Count I); tortious interference with contract against DPS (Count II); breach of the duty of loyalty against Thomson (Count III); unfair competition against both Defendants (Count IV); a violation of the federal Defend Trade Secrets Act, 18 U.S.C. §§ 1831 *et seq.* (Count V)[2]; a violation of the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code Ann., Com. Law §§ 11-1201 *et seq.* (Count VI); and civil conspiracy against both Defendants (Count VII).  (Compl., ECF No.

---

[1] Also before this Court is a suit filed November 18, 2020 against another former employee and DPS. *See ComRent Int'l, LLC v. Smidlein, et al.*, Civil Action No. RDB-20-3356.  This Court denied defendants' dismissal motion in that case and a scheduling order has been entered.  *Id.*, ECF Nos. 29, 30, 37.

[2] ComRent's claim under the federal Defend Trade Secrets Act is the basis for this Court's jurisdiction pursuant to federal question jurisdiction, 28 U.S.C. § 1331.  (*See* ECF No. 1 ¶ 5.)

1.)  Presently pending are Defendant Distributed Power Solutions, LLC's Motion to Dismiss (ECF No. 22) and Defendant Robert Thomson's Motion to Dismiss (ECF No. 23).  The parties' submission have been reviewed, and no hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2018).  For the reasons that follow, Defendant Distributed Power Solutions, LLC's Motion to Dismiss (ECF No. 22) and Defendant Robert Thomson's Motion to Dismiss (ECF No. 23) shall be DENIED.

## BACKGROUND

In ruling on a motion to dismiss, this Court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff."  *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)).

### A.  ComRent and Load Bank Industry

ComRent, a Maryland Limited Liability Company ("LLC"), is a provider of equipment and services used to test, commission, and maintain power generation systems. (*See* Complaint ¶¶ 2, 9, ECF No. 1.)  Specifically, ComRent supplies what are known as "load banks."  (*Id.* ¶ 10.)  Load banks are pieces of electrical test equipment used to simulate an electrical load and to test an electrical power source without connecting to its normal operating load.  (*Id.* ¶ 11.) ComRent rents its equipment to project owners in many different industries such as data centers and solar power generators.  (*Id.* ¶¶ 14-17.)  ComRent also helps project owners design and manage a testing protocol, train their personnel, and maintain their power systems.  (*Id.*)

ComRent tailors its services to each specific customer, as power generation systems differ significantly by industry.  (*Id.* ¶ 14.)  For example, a data center has different power

generation needs than a wind farm. (*Id.*) Industries differ not only in the types of power generation systems they use, but also in the regulations and safety standards to which they are subject. (*Id.* ¶ 15.) ComRent asserts that because power generation systems differ significantly by industry—and because each type of project owner is subject to different regulations, has varying safety requirements, and has distinct needs—there is a "large and naturally existing barrier to entry" for the load bank market. (*Id.* ¶ 17.) ComRent claims that over many years, through expertise developed over the course of thousands of projects and backed by millions of dollars in investments in equipment, human talent, and training, it has become the leading provider of load bank solutions. (*Id.*)

## B. Robert Thomson and His Employment at ComRent

Defendant Thomson, a resident of Colorado, began working for ComRent in June 2017. (*Id.* ¶¶ 3, 21.) During his employment, Thomson served as a "Project Manager," helping ComRent secure a project for a given client and coordinating the execution and completion of that project. (*Id.* ¶¶ 18-19.) This would involve determining what equipment was needed to do the project to prepare quotes, as well as logistics once the bid was secured. (*Id.* ¶ 20.) As a Project Manager, Thomson had access "to a constantly evolving and wide range of company records, confidential and proprietary information, as well as trade secrets that were relevant to the performance of his job." (*Id.* ¶ 26.) For example, ComRent asserts Thomson was the Project Manager for a project called "ECB2." (*Id.* ¶ 29.) For this project, ComRent was a subcontractor for an electrical contractor who was working on a project for the National Security Agency ("NSA"). (*Id.*) This electrical contractor required ComRent to execute a confidentiality/non-disclosure agreement and provided ComRent with confidential

information necessary to allow Thomson to design the project and its requirements. (*Id.* ¶ 32.) ComRent asserts that ECB2 is one of the company's largest projects and generates more than $4 million in revenue. (*Id.* ¶ 29.)

As a condition of employment with ComRent, Thomson was required to execute the ComRent Employee Confidentiality and Intellectual Property Agreement (the "Agreement"). (*See id.* ¶ 21; Agreement, Ex. A, ECF No. 1-1.) The Agreement requires Thomson not to disclose ComRent's "Confidential Information" except to perform his duties and responsibilities for ComRent. (*See* ECF No. 1-1 ¶ 2.) "Confidential Information" is defined as:

1) "information of any third-party to which ComRent has a duty of confidentiality";
2) "all forms of information relating either to ComRent, its subsidiaries, parent company or affiliates, or any of its clients or potential clients, learned by Employee through Employee's employment that is not generally known by or available to the public";
3) "ComRent's clients and prospective clients";
4) "unreleased, planned, or otherwise non-public information regarding ComRent's products, services, pricing, costs, profits, sales, marketing or business plans";
5) "budget, forecasts, and other non-public financial information";
6) "client requirements";
7) "internally developed methods of customer solicitation";
8) "information assembled relating to existing or prospective customers, or arrangements with customers or suppliers"
9) "possible acquisitions or divestitures, markets or market extensions"; and
10) "source code, processes, know-how, procedures, methods of operation, intellectual property, technical developments, including, but not limited to any software, documentation, work papers, or other materials and any and all information of such

a nature that a reasonable person would conclude that it is confidential or proprietary."

(*Id.* ¶ 1.)  Confidential Information does not include "information generally known or available to the public."  (*Id.*)  The agreement also requires an employee to return ComRent's documents and Confidential Information immediately upon request or termination of employment.  (*Id.* ¶ 8.)  Finally, the Agreement also requires an employee to acknowledge that ComRent would be entitled to an injunction and other remedies should he or she violate the Agreement. (*Id.* ¶ 4.)

### C.  Thomson's Resignation from ComRent and Subsequent Events

Thomson resigned from ComRent effective as of October 23, 2020 and commenced his employment with Defendant Distributed Power Solutions, LLC ("DPS"), a Texas Limited Liability Company.  (Compl. ¶¶ 4, 33, 39.)  At some point before it sought to hire Thomson, DPS was engaged in the business of supplying equipment and services designed for power generation systems.  (*Id.* ¶ 34.)  DPS was not a "load bank solutions" company like ComRent and, therefore, did not compete with ComRent in that market.  (*Id.*)  Instead, the company helped its customers build and operate generation systems.  (*Id.*)  However, ComRent alleges that, in the summer and fall of 2020, DPS decided to expand, and the company shifted to provide load bank equipment and related services, thereby competing with ComRent.  (*Id.*)  Over the course of the summer and fall of 2020, DPS hired five ComRent employees, including Thomson.  (*Id.* ¶ 40.)  It also changed its name to "Load Bank Solutions."  (*Id.* ¶ 41.)

On October 28, 2020, ComRent sent a letter to Thomson enclosing a copy of his Agreement and requesting that he return all ComRent records in his possession.  (*Id.* ¶ 43; letter attached as Ex. C, ECF No. 1-3.)  On October 29, 2020, ComRent also sent a letter to

Scott Milligan, the President of Energy Rental Solutions ("ERS"), who ComRent believed to be the parent company of DPS, and asked DPS to return and purge from its possession any documents that former ComRent employees obtained as a result of their employment with ComRent. (*Id.* ¶ 44; letter attached as Ex. D, ECF No. 1-4.) Thomson, via counsel of DPS, responded to ComRent's letter on November 6, 2020, asserting that he had not kept or forwarded to his employer any items of ComRent. (*Id.* ¶ 45; letter attached as Ex. E, ECF No. 1-5.) At this time, DPS also responded to ComRent's letter, stating that Thomson did not have any ComRent confidential information. (*Id.* ¶ 46; letter attached at Ex. F, ECF No. 1-6.)

Despite Thomson and DPS's claims that Thomson did not have any confidential information, ComRent's computer forensic expert completed an initial analysis of the ComRent computer used by Thomson during his employment. (*Id.* ¶ 47.) This analysis showed that "Three Hot Devices" (USB drives) had been connected to the laptop on October 21 and 22, 2020. (*Id.* ¶ 48.) Six other USB drives had been connected to the computer in the weeks and months leading up to Thomson's departure. (*Id.*) These USBs contained files and folders with names such as "Outlook Backup," "Work Files," and "ComRent." (*Id.*) During the time the USB drives were connected, files stored on the USB and the laptop were opened, accessed, and modified. (*Id.*) ComRent alleges that Thomson also had deleted more than 5,000 files from his computer on October 21 and 22, 2020 and had accessed "in rapid succession" a series of work-related files at all times of the day, including around 3:00 a.m., in the days and weeks leading up to his departure. (*Id.*)

Additionally, ComRent's analysis allegedly revealed that on October 22, 2020, a ".pst" file named "ECB2_Thomson_Emails" was created on Thomson's ComRent laptop.  (*Id.* ¶ 56.)  A ".pst" file is an open proprietary file form used to store copies of messages, calendar events, and other items within Microsoft software such as Microsoft Outlook.  (*Id.* ¶ 57.) These files allow a user to create a locally stored copy of the emails on a laptop or USB device. (*Id.* ¶ 57.) This specific ".pst" file contained more than 900 emails with numerous attachments, including files and spreadsheets containing highly confidential and proprietary information concerning the ECB2 project.  (*Id.* ¶ 58.)  The computer forensic expert also determined that on October 22, 2020, Thomson accessed a "zip" file named "ECB2_Thomson_Files."  (*Id.* ¶ 60.)  The "zip" file format allows for the compression of one or more files into a single file. (*Id.*)  ComRent believes that Thomson created the ".pst" file and then copied that file as well as the zip file onto one of the attached USB devices.  (*Id.*)

ComRent summarized its findings in a letter it sent to Thomson on November 20, 2020, expressing concern that Thomson's assurances that he had not taken ComRent information were inaccurate. (*Id.* ¶¶ 47, 48.)  On November 23, 2020, the lawyer who had been jointly representing Thomson and DPS stated he would be no longer be representing Thomson.  (*Id.* ¶ 49.)  That same day, ComRent emailed DPS asking it to look into the allegations concerning Thomson's removal of documents from ComRent.  (*Id.* ¶ 51; letter attached as Ex. I, ECF No. 1-9.)  DPS responded by copying and referring ComRent to Thomson's new lawyer.  (*Id.*)  This new attorney left a voicemail with ComRent's counsel on November 24, 2020 stating that Thomson was going to "cooperate fully," and that to the extent he had anything, they would retain it, not provide it to anyone else nor use it or destroy

it.  (*Id.* ¶ 50.)   The attorney also stated that Thomson was in Florida visiting family for Thanksgiving and he would not be back in Denver, where he operates, until the following week.  (*Id.*)  He repeated these statements in an email that same day.  (*Id.*; email attached as Ex. H, ECF No. 1-8.)

On November 25, 2020, ComRent again asked DPS to revisit its prior representations that former ComRent employees such as Thomson had not retained any records or information belonging or concerning ComRent.  (*Id.* ¶ 52; email attached as Ex. J, ECF No. 1-10.)  DPS did not respond.  (*Id.*)  Upon his return to Denver, Thomson provided twelve USB drives in his possession to ComRent's computer forensic expert so they could be imaged and inspected.  (*Id.* ¶ 53.)  However, ComRent alleges that none of the twelve devices provided were the "Three Hot Devices" that Thomson connected to his ComRent computer in the 72 hours before his departure.  (*Id.* ¶ 54.)

On December 5, 2020, ComRent sent another email to DPS, stating that a "key issue" was whether Thomson had connected his devices to any other computers, including DPS computers, and uploaded the ComRent content.  (*Id.* ¶ 55; letter attached as Ex. K, ECF No. 1-11.)  Accordingly, ComRent requested that DPS image any computers used by Thomson at DPS.  (*Id.*)  On December 7, 2020, DPS responded stating that it had searched for ComRent files on its servers and had not found any.  (*Id.* ¶ 67.)  ComRent responded that a search of the network would not reveal whether Thomson had locally uploaded any of the documents to a DPS computer.  (*Id.* ¶ 68.)

On December 17, 2020, Thomson informed ComRent that he was unable to locate all of the USB devices he had previously connected to his ComRent computer, including the

"Three Hot Devices" connected on October 21 and 22, 2020.  (*Id.* ¶ 71.)  In response to this information, ComRent requested that it be permitted to inspect Thomson's DPS computer to determine whether the missing devices had been connected by Thomson.  (*Id.*)  Thomson allegedly responded that his DPS computer had recently "gone on the fritz," and that he had sent it to DPS's IT department to be "wiped and reformatted."  (*Id.*)  ComRent requested Thomson take immediate action to halt the wiping on his DPS computer, and Thomson reported later that day that DPS had been instructed to put it aside and not conduct the wiping. (*Id.* ¶ 72.)

On December 18, 2020, ComRent wrote to DPS and asked that DPS "immediately commit to making a forensic image of the computer utilized by Robert Thomson to perform his duties on behalf of DPS," or in the alternative, to make the computer available so ComRent could make an image.  (*Id.* ¶ 73; letter attached as Ex. M, ECF No. 1-13.)  DPS responded that it had received the computer from Thomson and would leave the package unopened, but that it would not commit to conducting forensic imaging until ComRent's own review of Thomson's other data, i.e. the provided USB drives, was complete.  (*Id.* ¶ 74.)  ComRent sent two emails to DPS encouraging it to conduct the imagining and explaining the need and importance of the examination, but DPS did not respond.  (*Id.* ¶¶ 75, 76.)

**D. Procedural Background**

On December 28, 2020 ComRent filed this suit against Thomson and DPS, asserting seven causes of action: (1) breach of contract against Thomson (Count I); (2) tortious interference with contract against DPS (Count II); (3) breach of the duty of loyalty against Thomson (Count III); (4) unfair competition against both Defendants (Count IV); (5) a

violation of the federal Defend Trade Secrets Act, 18 U.S.C. §§ 1831 *et seq.* (Count V); (6) a

violation of the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code Ann., Com. Law

§§ 11-1201 *et seq.* (Count VI); and (7) civil conspiracy against both Defendants (Count VII).

(Compl., ECF No. 1.)

ComRent had also filed suit on November 18, 2020 against another former employee,

David Smidlein, and DPS. *See ComRent Int'l, LLC v. Smidlein, et al.*, Civil Action No. RDB-20-

3356. This Court denied defendants' dismissal motion in that case, finding that ComRent had

sufficiently pled claims for breach of contract and breach of fiduciary duty against Smidlein,

tortious interference with contract and aiding and abetting a breach of fiduciary duty against

DPS, and civil conspiracy against both Smidlein and DPS. *See id.*, ECF Nos. 29, 30.

On January 5, 2021, this Court entered an Agreed Preliminary Injunction in this case,

which, *inter alia*, enjoined Defendants from destroying, erasing, modifying, or otherwise

altering the records or documents in their possession, custody, or control that relate to the

events alleged in Plaintiff's Complaint.[3]  (ECF No. 14.)  On January 25, 2021, Defendants

DPS and Thomson filed their respective Motions to Dismiss (ECF Nos. 22, 23), arguing that

ComRent has failed to state claims for relief.

## STANDARD OF REVIEW

Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint must

contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint

---

[3] An Agreed Preliminary Injunction was also entered in the related case on February 3, 2021.  *See ComRent Int'l, LLC v. Smidlein, et al.*, Civil Action No. RDB-20-3356, ECF No. 32.

if it fails to state a claim upon which relief can be granted.  The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The United States Supreme Court's opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "require that complaints in civil actions be alleged with greater specificity than previously was required." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).  In *Twombly*, the Supreme Court articulated "[t]wo working principles" that courts must employ when ruling on Rule 12(b)(6) motions to dismiss. *Iqbal*, 556 U.S. at 678.  First, while a court must accept as true all factual allegations contained in the complaint, legal conclusions drawn from those facts are not afforded such deference. *Id.* (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *see also Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) ("Although we are constrained to take the facts in the light most favorable to the plaintiff, we need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." (internal quotation marks omitted)). Second, a complaint must be dismissed if it does not allege "a plausible claim for relief." *Iqbal*, 556 U.S. at 679.

While ruling on a motion to dismiss, a court's evaluation is generally limited to allegations contained in the complaint.  *Goines v. Calley Cmty. Servs. Bd.*, 822 F.3d 159, 166-67 (4th Cir. 2016).  However, courts may also consider documents explicitly incorporated into the complaint by reference.  *Id.* at 166 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S.

308, 322 (2007)).  In addition, a court may "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity."  *Id.* (citing *Sec'y of State for Defence v. Trimble Nav. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)).  A document is "integral" when "its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'"  *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F.Supp.2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis omitted). Considering such documents does not convert a motion to dismiss to one for summary judgment.  *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

## ANALYSIS

### I.  Preemption of Claims by the Maryland Uniform Trade Secrets Act ("MUTSA")

As a preliminary matter, Defendants argue that Plaintiff's claims for breach of contract (Count I), tortious interference with contract (Count II), breach of the duty of loyalty (Count III), and unfair competition (Count IV) are preempted by Plaintiff's claim brought pursuant to the Maryland Uniform Trade Secrets Act ("MUTSA").  Defendants assert that these claims rely on the same set of facts as Plaintiff's claim for misappropriation of trade secrets under MUTSA.  MUTSA indeed contains an express preemption provision, which provides that the statute "displaces conflicting tort, restitutionary, and other law of this State providing civil remedies for misappropriation of a trade secret."  Md. Code Ann., Com. Law § 11-1207(a).

However, as most recently explained by the Honorable Stephanie A. Gallagher of this Court in *Brightview Group, LP v. Teeters*: "in this district, the court has repeatedly held that state law claims based on non-trade secret information are not preempted" because information

that "does not qualify as a 'trade secret'…falls outside of MUTSA protection."  Civil Case No. SAG-19-2774, 2021 WL 1238501, at *21 (D. Md. Mar. 29, 2021) (quoting *Philips N. Am. LLC v. Hayes*, No. ELH-20-1409, 2020 WL 5407796, at *17 (D. Md. Sept. 9, 2020); *Telogis, Inc. v. InSight Mobile Data, Inc.*, No. PWG-14-563, 2014 WL 7336678, at *5 (D. Md. Dec. 19, 2014)); *Structural Preservation Sys., LLC v. Andrews*, No. MJG-12-1850, 2013 WL 3820023, at *5 (D. Md. July 23, 2013)).  Accordingly, claims for misappropriation of trade secrets that are *also* premised on "other confidential and proprietary information" are not entirely preempted by MUTSA. *See id.* (plaintiff's civil conspiracy claim not entirely preempted by MUTSA because, in addition to alleging misappropriation of trade secrets, plaintiff's claim was also based on a conspiracy to wrongly acquire and use non-trade secret confidential and proprietary information).

As a result, "alternative pleading is permitted" for a plaintiff to assert claims that both trade secrets were misappropriated under MUTSA and that non-trade secret, confidential information was also misappropriated.  *See Telogis*, 2014 WL 7336678, at *5 (citing *Swedish Civil Aviation Administration v. Project Management Enterprises, Inc.*, 190 F. Supp. 2d 785, 792, 802 (D. Md. 2002)).  That is precisely the nature of ComRent's claim in this case, alleging that "ComRent entrusted Thomson with confidential and proprietary information *and with trade secrets* which, as a ComRent employee, Thomson was obliged to protect." (Compl. ¶ 95 (emphasis added).)  In addition, ComRent alleges that Thomson breached his Agreement not to use or disclose "confidential information" which is defined "broadly" and includes "all forms of information…that is not generally known by or available to the public."  (Compl. ¶ 2; Agreement § 1, ECF No. 1-1.)  Accordingly, because ComRent's claims are based on the

alleged wrongful acquisition and use of its non-trade secret information, which is nonetheless confidential and proprietary, such claims are not preempted by MUTSA.

## II.      Claims against Thomson only (Counts I, III)

Defendant Thomson moves to dismiss Counts I (breach of contract) and III (breach of the duty of loyalty) of ComRent's Complaint, arguing that those Counts are based only on speculation over what Thomson "*could have done after* he left Plaintiff's employment" and not on what Thomson allegedly did *before* he left employment with ComRent.  (ECF No. 23 at 5.) In general, to prevail on a claim for breach of contract, a plaintiff "must establish 'contractual obligation, breach, and damages.'" *Due Forni LLC v. Euro Restaurant Solutions, Inc.*, PWG-13-3861, 2018 WL 4961653, at *5 (D. Md. Oct. 15, 2018) (citing *Tucker v. Specialized Loan Servicing, LLC*, 83 F. Supp. 3d 635, 655 (D. Md. 2015) (quoting *Kumar v. Dhanda*, 17 A.3d 744, 749 (Md. Spec. Ct. App. 2011))); *see also U.S. v. Gypsum Co. v. Quigley Co. (In re G-I Holdings, Inc.)*, 755 F.3d 195, 202 (3d Cir. 2014).

ComRent has adequately alleged a contractual obligation owed by Thomson to ComRent through his employment.  (Compl. ¶¶ 18, 21, 22.); *see also MSC Servs., Inc. v. Jones*, No. WMN-10-1042, 2010 WL 3895380, at *3 (D. Md. Oct. 1, 2010) (under Maryland law, businesses may use confidentiality agreements to prevent the disclosure of trade secrets to third parties).  Further, under the Agreement, Thomson "committed to protect and maintain ComRent's confidential information," agreed to "hold Confidential Information in confidence," and to "promptly return to ComRent" all confidential information upon request by ComRent.  (*Id.* ¶¶ 22, 24; Agreement §§ 2, 8, ECF No. 1-1.)  ComRent alleges that Thomson breached this Agreement by failing to return confidential information when he began working

for DPS.  (Compl. ¶¶ 22, 24.)  Specifically, ComRent alleges that its computer forensic expert completed an initial analysis of the ComRent computer used by Thomson during his employment, which showed that multiple USB drives had been connected to the computer in the weeks and months leading up to Thomson's departure.  (*Id.* ¶¶ 47, 48.) These USBs contained files and folders with names such as "Outlook Backup," "Work Files," and "ComRent."  (*Id.*)  During the time the USB drives were connected, files stored on the USB and the laptop were opened, accessed, and modified.  (*Id.*)  ComRent alleges that Thomson also had deleted more than 5,000 files from his computer on October 21 and 22, 2020 and had accessed "in rapid succession" a series of work-related files at all times of the day, including around 3:00 a.m., in the days and weeks leading up to his departure.  (*Id.*)  When ComRent repeatedly sought the return of its confidential information from Thomson, he claimed that his computer at DPS had "gone on the fritz" and that he had sent it to be "wiped and reformatted."  (*Id.* ¶ 71.)  These allegations are more than sufficient to state a claim for breach of contract.

ComRent has also sufficiently pled a claim for breach of the duty of loyalty against Thomson.  Under Maryland law, "every employment contract contains an 'implied duty [of loyalty] that an employee act solely for the benefit of his employer in all matters within the scope of his employment.'"  *Philips North Am. LLC v. Hayes*, No. ELH-20-1409, 2020 WL 5407796, at *10 (D. Md. Sept. 9, 2020) (quoting *Maryland Metals Inc. v. Metzner*, 282 Md. 31, 38, 382 A.2d 564, 568 (1978)).  Breach of this duty includes "fraudulent, unfair, or otherwise wrongful act[s] such as misappropriation of trade secrets, conspiracy to bring about mass resignation of key employees or interference with an employer's business opportunities."  *Id.*

(quoting *EndoSurg Medical, Inc. v. EndoMaster, Inc.*, 71 F. Supp. 3d 525, 556 (D. Md. 2014)). Here, ComRent has sufficiently alleged such a breach by its allegations that Thomson accessed and used confidential information during and after his employment to benefit himself and/or his new employer, DPS. (*See* Compl. ¶ 95.)

### III.   Claim against DPS only (Count II)

ComRent has also sufficiently alleged a claim for tortious interference with contract against DPS. Under Maryland law, the elements of tortious interference with contract are: (1) existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of the contract by the third party; and (5) resulting damages to the plaintiff. *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 249 F. Supp. 2d 703, 710 (D. Md. 2003). Here, ComRent has alleged that Thomson copied ComRent files onto a USB device and took them with him to DPS. (Compl. ¶¶ 60, 65, 78.) ComRent also alleges that DPS has been complicit in Thomson's alleged failure to return the confidential information taken from ComRent by "refusing to cooperate in the return of ComRent information contained on Thomson's DPS computer," failing to take "the most obvious and genuine steps aimed at recovering and returning materials stolen from ComRent (*e.g.*, imaging and inspecting Thomson's DPS computer)" and "using ComRent's Confidential Information by and through DPS employees." (*Id.* ¶¶ 77-79, 90.) Moreover, DPS' assertion that ComRent cannot identify any piece of confidential information DPS possesses is disingenuous, as ComRent has not yet had the opportunity to examine Thomson's DPS computer which has been "on the fritz" and was almost "wiped and reformatted." (*Id.* ¶ 71.) These allegations suffice to state a claim for tortious interference with contract.

16

**IV.     Claims against both Thomson and DPS (Counts IV, V, VI, VII)**

Thomson and DPS assert that ComRent has failed to state claims for unfair competition, misappropriation of trade secrets, and civil conspiracy.  The Court is satisfied, however, that ComRent's allegations sufficiently state these claims for relief.

**A.  Unfair Competition (Count IV)**

A claim for unfair competition exists where a party competes against another by employing "fraud, deceit, trickery, or unfair methods of any sort."  Maryland recognizes the tort of unfair competition because "no one ... is justified in damaging or jeopardizing another's business by fraud, deceit, trickery, or unfair methods of any sort." *Baltimore Bedding Corp. v. Moses*, 182 Md. 229, 236-37 (1943).  "Acts that can constitute unfair competition include those that 'substantially interfere[ ] with the ability to compete ... or conflict [ ] with accepted principles of public policy.'" *Brightview Grp. v. Teeters*, 441 F. Supp. 3d 115, 134-35 (D. Md. 2020) (quoting *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 691 (D. Md. 2012)).  What constitutes unfair competition in a given case is governed by that case's particular facts and circumstances.  *Id.*

ComRent has alleged that Thomson engaged in unfair competition by stealing ComRent's trade secrets and confidential information, lying about it, and refusing to return the USB drives on which they exist.   (Compl. ¶¶ 98-99.)  ComRent also alleges that DPS, as a direct competitor to ComRent, aided and abetted this misconduct by refusing to examine Thomson's DPS computer and refusing to cooperate in investigating Thomson's alleged theft.  (*Id.* ¶¶ 35, 36, 77.)  These allegations are sufficient to state a claim for unfair competition against both Thomson and DPS.

**B. Misappropriation of Trade Secrets under Maryland and Federal Law (Counts V and VI)**

The federal Defend Trade Secrets Act provides that a trade secret is misappropriated when a person either (1) acquires a trade secret while knowing, or having reason to know, that the trade secret was acquired by improper means, 18 U.S.C. § 1839(5)(A), or (2) uses or discloses the trade secret after acquiring it through improper means, *id.* § 1839(5)(B)(i). The Maryland Uniform Trade Secrets Act mirrors the federal DTSA. *Compare id. with* Md. Code Ann., Com. Law § 11-1201; *see Brightview Group, LP v. Teeters*, 441 F. Supp. 3d 115, 132 (D. Md. 2020). "Improper means" of acquiring a trade secret includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A); Md. Code Ann., Com. Law § 11-1201(b).

ComRent has alleged that the ECB2 project documents and ComRent's written safety protocols are trade secrets within the meaning of DTSA and MUTSA. (Compl. ¶¶ 101-116.) Moreover, ComRent has specifically detailed the alleged misappropriation by both Thomson and DPS by alleging, *inter alia*, that Thomson copied ComRent files onto a USB device and took them with him to DPS (*id.* ¶¶ 60, 65, 78) and that DPS has been complicit in Thomson's alleged failure to return the confidential information taken from ComRent by "refusing to cooperate in the return of ComRent information contained on Thomson's DPS computer," failing to take "the most obvious and genuine steps aimed at recovering and returning materials stolen from ComRent (*e.g.*, imaging and inspecting Thomson's DPS computer)" and "using ComRent's Confidential Information by and through DPS employees" (*id.* ¶¶ 77-79, 90).

Again, DPS' argument that ComRent cannot identify any piece of confidential information DPS possesses is unavailing, as ComRent has not yet had the opportunity to examine Thomson's DPS computer which has been "on the fritz" and was almost "wiped and reformatted." (*Id.* ¶ 71.) Accordingly, ComRent has sufficiently pled claims for misappropriation of trade secrets under the federal Defend Trade Secrets Act and the Maryland Uniform Trade Secrets Act.

### C. Civil Conspiracy (Count VII)

ComRent asserts a claim for civil conspiracy against both Defendants, alleging that Thomson and DPS formed and operated a malicious combination with a common design to injure ComRent. (ECF No. 1 ¶¶ 117-118.) Defendants challenge this claim on the grounds that Maryland law does not recognize civil conspiracy as an independent cause of action. It is true that Maryland law does not recognize an *independent* cause of action for civil conspiracy. *Davenport v. Maryland*, 38 F. Supp. 3d 679, 693 (D. Md. 2014) (citing *Clark v. Md. Dep't Pub. Safety & Corr. Servs.*, 247 F. Supp. 2d 773, 777 (D. Md. 2003). A plaintiff's claim for civil conspiracy "depends entirely on its liability for a substantive tort." *Id.* However, ComRent may prevail on a claim for civil conspiracy if it does prevail on its tort claims of breach of the duty of loyalty, unfair competition, or tortious interference with contract as provided in Counts II, III, and IV.

Maryland courts define tortious civil conspiracy as "'a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff.'" *Id.* (quoting *Hoffman v. Stamper*, 867

A.2d 276, 290 (Md. 2005) (internal quotations and citations omitted)).    Count VII of ComRent's Complaint incorporates by reference all of the allegations of its Complaint regarding the Defendants' alleged wrongful conduct, and asserts that the Defendants "operated a malicious combination with a common design to injure ComRent" by (1) unlawfully violating ComRent's contractual, statutory, and common law rights in order to divert business and economic gain from ComRent, and/or (2) performing lawful acts of competing with ComRent but through the unlawful means of violating ComRent's contractual, statutory, and common law rights. (Compl. ¶¶ 117-122.)  ComRent also asserts it has sustained injuries and damages as a result of this conduct.  (*Id.*)  Accordingly, ComRent has stated a plausible claim for civil conspiracy under Maryland law.

## V.    Punitive Damages

Finally, Defendants argues that ComRent has not pled facts sufficient to support a demand for punitive damages.  Under Maryland law, punitive damages must be specifically pled in a complaint.  *Scott v. Jenkins*, 690 A.2d 1000, 1006 (Md. 1997).  As the court in *Scott* explained, "[a] plaintiff seeking to recover punitive damages must allege *in detail* in this complaint the facts that indicate the entertainment by the defendant of [an evil motive or intent]."  *Id.* (citing John A. Lynch, Jr. & Richard W. Bourne, Modern Maryland Civil Procedure § 6.5(b)(2)) (alterations in original).

In this case, ComRent asserts that Thomson breached a duty of loyalty to ComRent and "has gone to great lengths to conceal his misconduct, including by lying about whether he took records and information from ComRent and failing to return the USB drives he connected to ComRent's computer." (Compl. ¶ 106.)  ComRent has also alleged that DPS

"willfully, intentionally, and/or recklessly interfered" with the performance of Thomson's Agreement (*id.* ¶ 90), "has failed and intentionally refused to take the most obvious and genuine steps aimed at recovering and returning materials stolen from ComRent" (*id.* ¶ 77(e)), and "formed and operated a malicious combination with a common design to injure ComRent" (*id.* ¶ 118). ComRent further asserts that Defendants' conduct was performed with intent to injure ComRent and without privilege or justification. (*Id.* ¶ 119.) At this stage, ComRent has pled facts sufficient to support a demand for punitive damages.

## CONCLUSION

For the foregoing reasons, Defendant Distributed Power Solutions, LLC's Motion to Dismiss (ECF No. 22) is DENIED and Defendant Robert Thomson's Motion to Dismiss (ECF No. 23) is DENIED.

A Separate Order follows.

Dated: May 3, 2021

_____/s/_____
Richard D. Bennett
United States District Judge